John W. Leardi
Nicole P. Allocca
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
609-799-5150

Leslie Howard
Michael Fried
COHEN HOWARD, LLP
766 Shrewsbury Ave., Suite 200
Tinton Falls, NJ 07724
732-747-5202

*Attorneys for Plaintiff*
*Atlantic Neurosurgical Specialists, P.A.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ATLANTIC NEUROSURGICAL SPECIALISTS, P.A., | : <br> : <br> : No.: 20-cv-10685-LLS <br> : |
| *Plaintiff,* | : <br> : <br> : |
| - v. - | : **FIRST AMENDED COMPLAINT** <br> : |
| MULTIPLAN, INC; CIGNA HEALTH AND LIFE INSURANCE COMPANY, and UNITED HEALTHCARE INSURANCE COMPANY, | : <br> : <br> : <br> : <br> : |
| *Defendants.* | : <br> : |

Plaintiff Atlantic Neurosurgical Specialists, P.A. ("Atlantic Neuro"), through its undersigned counsel and by way of Complaint against Defendants MultiPlan, Inc. ("MultiPlan"), Cigna Health and Life Insurance Company ("Cigna"), and UnitedHealthcare Insurance Company ("United"), hereby alleges as follows:

1.  This action largely stems from a reimbursement dispute between a medical practice on the one hand, and a participating provider organization network administrator and its third-party payer clients on the other. The dispute principally arises from the relationships and obligations created by the MultiPlan Participating Professional Group Agreement entered by Atlantic Neuro and MultiPlan in 2011 (the "Provider Agreement"). The Provider Agreement entitles Atlantic Neuro—who

does not contract directly with payers such as Cigna and United—to be paid at the "Contract Rate" delineated in the Provider Agreement when treating a patient whose health benefit plan elects to participate in MultiPlan's Network Savings Program. However, when it came time to pay the Plaintiff for services rendered, Defendants made grossly insufficient, partial payments contrary to their duties under (a) the Provider Agreement or (b) implied-in-fact agreements established over the parties' course of dealings and industry standards. This action is brought to hold Defendants accountable for their failure to make payment in accordance with the forgoing contracts.

## THE PARTIES

**A.    Plaintiff Atlantic Neuro.**

2.    Founded in 1958, Atlantic Neuro is the largest neurosurgical practice in New Jersey and one of the most advanced in the country. It offers the full spectrum of surgical treatment and management of patients with neurosurgical problems through a complement of sub-specialized, board certified, and board eligible neurosurgeons that make it one of the premier neurosurgery practice for surgical procedures involving the brain, spine/peripheral nervous, and neurovascular systems in New Jersey. Atlantic Neuro maintains offices throughout New Jersey, including an office located at 3700 Route 33, Suite B, Neptune, New Jersey 07753.

3.    Atlantic Neuro's brain specialists have expertise in treating a variety of conditions and have organized clinical programs in skull base surgery, stereotactic radiosurgery, neuro-oncology, and endoscopic pituitary surgery. Its patients benefit from highly specialized care, bringing together experts in neurosurgery, otolaryngology, radiation oncology, medical oncology, neuroradiology, neuro-ophthalmology, neurology, neuropathology, physiatry, and social work. Brain conditions treated by Atlantic Neuro include malignant and low-grade gliomas, metastatic brain tumors, lymphomas, meningiomas, pituitary adenomas, acoustic neuromas/schwannomas, colloid cysts, and pineal tumors.

4.      Atlantic Neuro's multidisciplinary team of board-certified, fellowship-trained spine specialists treat the full spectrum of spinal disorders, from compression fractures and degenerative disc disease, to herniated discs, osteoarthritis, osteoporosis, rheumatoid arthritis, stenosis, sciatica, scoliosis, spinal tumors and more. Its neurosurgeons offer unparalleled expertise in an array of sophisticated spinal procedures for the treatment of disk problems, stenosis, tumors, fractures, deformity, and instability, utilizing the very latest techniques and equipment available, including spinal navigation, disc replacement, minimally invasive decompression, fusion procedures, and Cyberknife for the treatment of spinal tumors.

5.      Atlantic Neuro also serves as a primary referral center providing stroke and neurovascular treatments. Its neurovascular specialists consist of neurosurgeons, radiologists, stroke neurologists, neuro-intensivists, and stroke rehabilitation experts, which treat patients suffering from ischemic, hemorrhagic, and other vascular conditions with a combination of endovascular surgery and open neurosurgical procedures.

**B.      Defendant MultiPlan.**

6.      MultiPlan is a New York corporation with its principal place of business at 115 Fifth Avenue, New York, NY 10003. Multiplan, among other things, develops and operates healthcare provider networks.

7.      MultiPlan contracts with over a 1.2 million healthcare providers, who in turn are provided access to patients enrolled in Benefit Programs offered by MultiPlan's Clients, who include insurance companies, and Users, who include both self-funded benefits plans and individuals who enroll in a MultiPlan discount card program.

8.      Multiplan is licensed by the New Jersey Department of Banking and Insurance ("NJ-DOBI") as an organized delivery system and conducts business in the state accordingly.

**C.**     **Defendant Cigna.**

9.     Cigna is an operating subsidiary of Cigna Corporation with a principal place of business of Two Chestnut Place, 1601 Chestnut Street, Philadelphia, PA 19192.

10.     Cigna offers, underwrites, and administers Benefit Programs through which healthcare expenses incurred by program insureds for services and/or products covered by the Benefit Programs are reimbursed by and/or through Cigna.

11.     Cigna is licensed by the NJ-DOBI to do business in New Jersey and conducts business in the state accordingly.

12.     Cigna is a Client and/or User of MultiPlan as defined in the Provider Agreement.

**D.**     **Defendant United.**

13.     United is a wholly-owned and controlled subsidiary of Unimerica, Inc., which is wholly-owned and controlled by United HealthCare Services, Inc., with a principal place of business located at 9900 Bren Road East, Minnetonka, Minnesota 55343.

14.     United offers, underwrites, and administers Benefit Programs through which healthcare expenses incurred by program insureds for services and/or products covered by the Benefit Programs are reimbursed by and/or through United.

15.     United is licensed by NJ-DOBI to do business in New Jersey and conducts business in the state accordingly.

16.     United is a Client and/or User of MultiPlan as defined in the Provider Agreement.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over Atlantic Neuro's claims under 28 U.S.C. § 1332 (diversity jurisdiction) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is brought by a citizen of New Jersey (Atlantic Neuro) against citizens of New York (MultiPlan), Pennsylvania (Cigna), and Minnesota (United).

18.     Venue is appropriate in this District because the Paragraph 9.3 of the Provider Agreement states that "[v]enue of any dispute litigated between the parties shall be in Federal court in the state and county of residence of the defendant." MultiPlan is a resident of this District.

19.     This Court has personal jurisdiction over the remaining Defendants because both Cigna and United have substantial contacts with, and regularly conduct business in this District.

20.     This Court's construction of the Provider Agreement, and the parties respective obligations thereunder, shall be governed by New Jersey law, as Paragraph 9.3 of the Provider Agreement indicates it is to be constructed under Federal laws and regulations, as well as the laws of the state in which health care services are rendered hereunder. All surgical and other medical services provided by Atlantic Neuro relative to its claims here were provided in New Jersey.

## MULTIPLAN CONTRACT RATES AND SHARED SAVINGS FEES

21.     Cigna and United are in the business of administering health plans. In that role, Cigna and United receive, review, and processes benefits claims for services rendered by to members enrolled in those plans by medical service providers ("providers").

22.     In addition to underwriting traditional health insurance or "fully insured" health plans, many of Cigna and United's Plans are "self-funded" where the plan sponsor is responsible for payment of claims from its own funds and those contributed by employees. For those plans, Cigna and United act as a third-party fiduciary and claims administrator.

23.     Providers are largely paid by health plan administrators like Cigna and United based on whether they have a participating provider agreement, which will drive their classification as either in-network ("INET") or out-of-network ("ONET").

24.     A ONET, or non-participating provider, is typically reimbursed for services at the usual, customary, and reasonable ("UCR") rate, which is determined by assessing the charge of similar providers, offering a similar service, in the same geographic region. If a patient's health

benefit plan fails to pay the full rate, an ONET provider is permitted, and sometimes required, to bill the patient for the outstanding balance.

25.     Contrastingly, an INET, or participating, provider is reimbursed for services covered by a patient's health benefit plan based on rates set forth in the agreement between the provider and the health insurance company. Under this agreement, the health plan administrator encourages its insured to utilize contracted INET providers, and they usually prohibit a provider from balance billing the patient.

26.     Defendant MultiPlan offers a so-called Complementary Provider Network which health plan administrators use as a secondary network to a health plan administrator's preferred provider network. In achieving this end, MultiPlan contracts with ONET providers on one end, and health plan administrators on the other end to (a) offer providers access to a broader patent base and (b) offer health benefit administrators and their members discounted rates from the UCR rates charged by providers that are otherwise ONET.

27.     In consideration for joining MultiPlan's Complementary Provider Network, providers are reimbursed a defined percentage of their UCR charges, the "Contract Rate," for services provided to patients whose health benefit plans participate in the MultiPlan's Complementary Provider Network.

28.     Notably, when a health plan administrator such as Cigna or United contracts with MultiPlan to access its Complementary Provider Network and the Contract Rate payable to ONET providers thereunder, not every one of the plans they administer are MultiPlan's Complementary Provider Network, i.e., not every one of Cigna's and United's plans participate in MultiPlan's Complementary Provider Network.

29.     Instead, those plans that do participate in MultiPlan's Complementary Provider

Network can be identified by viewing the insurance card issued to members of that plan, and specifically through the placement of the MultiPlan or some other related logo on that member's insurance card. This lets the member, and their providers, know that the member's health plan participates in MultiPlan's Complementary Provider Network.

30.     In exchange for accessing the Contract Rate for services rendered by providers enrolled in MultiPlan's Complementary Provider Network, Cigna and United receive two significant financial incentives, depending on the type of benefit plan in issue.

31.     For fully-insured plans, for which Cigna and United are responsible to pay claims directly, the principal benefit of accessing the Complementary Provider Network is the savings associated with paying providers the Contracted Rates, as opposed to their UCR charges.

32.     For self-insured plans, Cigna and United are typically paid a "Shared Savings Fee" by their self-insured clients whereby those self-insured clients pay Cigna and United a percentage of the "delta" between the provider's UCR charges and the amount ultimately paid on the claims in question, which, of course, for health plans accessing MultiPlan's Complementary Provider Network should be the Contracted Rates.

33.     For claims Cigna and United administer for their self-funded employer clients, there is a direct financial incentive for Cigna and United to pay ONET providers as little as possible, irrespective of any obligation to pay Contracted Rates, because the less Cigna and United pay on these claims, the more they charge their self-funded clients in Shared Savings Fees.

34.     MultiPlan's compensation from Cigna and United is a portion of the Shared Savings Fees generated using its Complementary Provider Network. So here again, the less Cigna and United pay on these claims, the more MultiPlan receives in the form of its split.

**THE PROVIDER AGREEEMENT**

35.     In 2011, MultiPlan solicited and induced Atlantic Neuro to join its participating

provider network and to agree to accept payment, based on a percentage of Atlantic Neuro's UCR charges for surgical and other related medical services rendered to Atlantic Neuro's patients enrolled in "Benefit Programs" offered by MultiPlan's "Clients" and "Users," including, *inter alia*, Cigna and United.

36.     Under the Provider Agreement, MultiPlan represented to Atlantic Neuro that its Clients and Users would pay Contract Rate to Atlantic Neuro for surgical and other related medical services rendered to Atlantic Neuro's patients enrolled in Benefit Programs underwritten and/or administered by Cigna and United when any such patient accesses the MultiPlan's Complementary Provider Network.

37.     Paragraph 1.14 of the Provider Agreement states that the MultiPlan's Complementary Provider Network logo is identified on a patient's insurance card.

38.     Atlantic Neuro is a Participating Professional as defined under Paragraph 1.13 of the Provider Agreement, which states Atlantic Neuro is bound to provide services pursuant to the Provider Agreement when presented with a patient participating in the MultiPlan's Complementary Provider Network. Paragraph 3.4 compels a Participating Professional to use all reasonable efforts to accept all Participants for treatment.

39.     Under Paragraph 1.6 of the Provider Agreement, as modified by an Amendment executed by and among Atlantic Neuro and MultiPlan on or about January 15, 2015, Atlantic Neuro's Contract Rate under the Provider Agreement are 70% of its billed charges.

40.     Under Paragraph 4.3 of the Provider Agreement, MultiPlan warranted that "it has entered into agreements with Clients that specify that the right to access the Network, including access to the Contract Rate, shall be subject to the terms of this Agreement."

41.     Under Paragraph 4.7 of the Provider Agreement, MultiPlan warranted that it "will

require Clients and its Users to use the Contract Rate agreed to in this Agreement solely for Covered Services rendered to Participants covered under a Program which utilizes the Network."

42.     Under Paragraph 5.4 of the Provider Agreement, Participating Professionals cannot balance bill the patient beyond the patient's Deductible and/or Co-insurance in exchange for payment of the Contract Rate.

## ATLANTIC NEURO'S COURSE OF DEALING WITH CIGNA AND UNITED

43.     Both Cigna and United engaged in representations, routine correspondence, and conduct surrounding the participation of the health benefit plans they administer in the MultiPlan's Complementary Provider Network that would lead a reasonable healthcare provider, such as Atlantic Neuro, to believe that they had entered into implied-in-fact contracts to honor the Contract Rate when services were rendered by Atlantic Neuro's physicians to patients presenting with Cigna and/or United insurance cards bearing the MultiPlan logo.

44.     As per the terms of the Provider Agreement, specifically Paragraph 1.14, Atlantic Neuro could and did reasonably expect to be paid at the contracted MultiPlan rate when patients' insurance cards featured the MultiPlan logo.

45.     These expectations of payment are further established by both Cigna and United's conduct through a long and consistent course of dealing with Atlantic Neuro. This conduct viewed by a reasonable person in the relevant trade, i.e., by a member of the MultiPlan's Complementary Provider Network providing ONET services to patients enrolled in health benefit plans administered by Cigna and United, clearly revealed a promise by Cigna and/or United to pay Contract Rate when services were rendered by Atlantic Neuro's physicians to patients presenting with Cigna and/or United insurance cards bearing the MultiPlan or a related logo.

46.     Atlantic Neuro has an established course of dealing with Cigna health benefit plans

that bear the MultiPlan logo. Specifically, when a plan member's card has the MultiPlan logo, Cigna has, before, during, and after the relevant dates of service at issue in this lawsuit, compensated Atlantic Neuro at the Contract Rate.

47.     The dates of service at issue in this action surrounding Cigna's claims for benefits range from November 9, 2017, to March 6, 2019.

48.     Prior to the earliest date at issue here, Cigna had established a course of dealing with Atlantic Neuro whereby Cigna would pay the Contracted Rates when services were rendered by Atlantic Neuro's physicians to patients presenting with Cigna insurance cards bearing the MultiPlan or a related logo.

49.     Examples of this course of dealing include claim payments made by Cigna to Atlantic Neuro at the Contract Rate for services provided to patients other than those whose claims are in issue here, which patients presented to Atlantic Neuro with insurance cards bearing the MultiPlan or a related logo, on July 29, 2016; and, in 2017 on; February 14; April 18, 28; May 15, 20, 25; July 1, 5, 16.

50.     The written Explanation of Benefits ("EOB") letters issued by Cigna to both Atlantic Neuro and the underlying Cigna member for each of these claims included the following language, plainly acknowledging the application of the Contract Rate to the services in question: "HEALTH CARE PROFESSIONAL: DO NOT BILL THE PATIENT FOR THE MULTIPAN DISCOUNT THROUGH MULTIPLAN."

51.     This course of dealing between Cigna and Atlantic Neuro continued during the timeframe that the claims in issue in this case were underpaid. For example, Cigna paid Atlantic Neuro the Contract Rate for services provided to patients other than those whose claims are in issue here, which patients all presented to Atlantic Neuro with insurance cards bearing the

MultiPlan or a related logo, on December 1, 2017, June 27, 2018, February 23, 2019, and March 5, 2019. The EOBs issued by Cigna to both Atlantic Neuro and the underlying Cigna member for each of these claims included the same language as the previous examples.

52.     This course of dealing between Cigna and Atlantic Neuro continued after the timeframe that the claims in issue in this case were underpaid. For example, Cigna paid Atlantic Neuro the Contract Rate for services provided to patients other than those whose claims are in issue here, which patients presented to Atlantic Neuro with insurance cards bearing the MultiPlan or a related logo in 2019, on April 15, 24; May 7; June 10, 11, 12, 13, 14, 16; July 15; and September 8. The EOBs issued by Cigna to both Atlantic Neuro and the underlying Cigna member for each of these claims included the same language as the previous examples.

53.     Atlantic Neuro has an established an identical course of dealing with United health benefit plans that bear the MultiPlan logo. Specifically, when a plan member's card has the MultiPlan logo, United has, before, during, and after the relevant dates of service at issue in this lawsuit, compensated Atlantic Neuro at the Contract Rate.

54.     The dates of service at issue in this action surrounding United's claims for benefits range from December 17, 2018, to February 22, 2019.

55.     Prior to the earliest date at issue here, United had established a course of dealing with Atlantic Neuro whereas United would expressly pay the Contract Rate for claims for patients whose cards featured the MultiPlan logo.

56.     Examples of this course of dealing include claim payments made by United to Atlantic Neuro at the Contract Rate for services provided to patients other than those whose claims are in issue here, which patients presented to Atlantic Neuro with insurance cards bearing the MultiPlan or a related logo in 2017, on August 29; September 1, 19; October 13, 16, 24, 31;

November 6, 9, 10, 11, 12, 13 29; and December 4.

57.     The written EOB letters issued by United to both Atlantic Neuro and the underlying United member for each of these claims included the following language, plainly acknowledging the application of the Contract Rate to the services in question: "THIS PHYSICAN OR HEALTHCARE PROVIDER IS OUT-OF-NETWORK, BASED ON AN AGREEMENT WITH MULTIPLAN, THE PROVIDER HAS ACCEPTED A DISCOUNT FOR THIS SERVICE. THE DISCOUNT SHOWIN IS YOUR SAVINGS AND NOT INCLUDED IN THE AMOUNT YOU OWE."

58.     This course of dealing between United and Atlantic Neuro continued during the approximate timeframe that the claims in issue in this case were underpaid. For example, United paid Atlantic Neuro the Contract Rate for services provided to patients other than those whose claims are in issue here, which patients presented to Atlantic Neuro with insurance cards bearing the MultiPlan or a related logo in 2019, January 2, 4, 7, 18; March 7; and, April 6, 22, 26, 29. The EOBs issued by United to both Atlantic Neuro and the underlying United member for each of these claims included the same language as the previous examples.

59.     This course of dealing between United and Atlantic Neuro continued timeframe that the claims in issue in this case were underpaid. For example, United paid Atlantic Neuro the Contract Rate for services provided to a patient other than those whose claims are in issue here, which patient presented to Atlantic Neuro with insurance cards bearing the MultiPlan logo on February 9, 2021. The EOB issued by United to both Atlantic Neuro and the underlying United member included the following language, plainly acknowledging the application of the Contract Rate to the services in question: "THIS OUT OF NETWORK PROVIDER HAS ACCEPTED A DISCOUNT FOR THIS SERVICE BASED ON AN AGREEMENT WITH MULTIPLAN."

60.     This pattern of dealing between Cigna and United on the one hand and Atlantic Neuro on the other is clear: when Atlantic Neuro renders service for patients whose plans are contracted with the MultiPlan's Complementary Provider Network (as indicated on their insurance card), United and Cigna reimburse Atlantic Neuro at the Contract Rate.

61.     This conduct is further illustrated by the EOBs from both companies, which acknowledge the existence of the MultiPlan Contract Rate in assessing their obligations in determining the relevant pricing information for the services provided.

62.     Further, in Atlantic Neuro's recent correspondence with United over an unrelated claim, United explained that the claim was to be priced using "Shared Savings" agreements and that MultiPlan is part of the Shared Savings Program. Again, United confirming and establishing their obligations to Atlantic Neuro to compensate them at the Contracted Rate.

63.     A reasonable healthcare provider would consider this course of conduct to indicate an implicit promise to pay the Contract Rate. Especially considering that Cigna and United's conduct was consistent with the agreement that Atlantic Neuro had with MultiPlan. The language in the EOBs and other communications from Cigna and United to Atlantic Neuro and its patients, along with the affirmative act of consistently and repeatedly paying Atlantic Neuro the Contract Rate over a period of several years confirm as much.

64.     Considering the consistent course of dealing that both United and Cigna engaged in regarding the payment of claims for insureds whose cards featured the MultiPlan logo, Atlantic Neuro reasonably relied upon the conduct of the health plan administrators, i.e., Cigna and United, as a promise to pay the contracted rate in future dealings.

65.     Another example of conduct on the part of Cigna and United that reveals a promise to pay to Atlantic Neuro, is illustrated by the marketing and promotional materials that both parties

have widely circulated and have made available for public viewing on their websites.

66.     Cigna's website states that "if the MultiPlan Savings Program logo appears on your Cigna ID card, you may be eligible to receive discounts when using an ONET, non-participating health care professional or facility that participates in the Network Savings Program."

67.     Atlantic Neuro is a participating facility in the MultiPlan Savings Program, and this representation from Cigna's website mirrors the billing explanation provided with Cigna's EOB's for MultiPlan patients which state: "DO NOT BILL THE PATIENT FOR THE MULTIPAN DISCOUNT THROUGH MULTIPLAN."

68.     Similarly, United's website states; "United may have the right to access contracts and discounts that certain third parties have with ONET providers. When this program applies, the ONET provider's billed charges will be discounted."

69.     Atlantic Neuro is an ONET provider that has a contract with MultiPlan that allows Atlantic Neuro's billed charges to be discounted. The language on United's website is mirrored in the EOB's for MultiPlan patients that state: "THIS PHYSICAN OR HEALTHCARE PROVIDER IS OUT-OF-NETWORK, BASED ON AN AGREEMENT WITH MULTIPLAN, THE PROVIDER HAS ACCEPTED A DISCOUNT FORTHIS SERVICE."

70.     Both Cigna and United used their participation in the MultiPlan's Complementary Provider Network as a marketing tool. This is, of course, with the intention of inducing consumers and self-funded plan sponsors to purchase health coverage or claim administration from Cigna and United to gain access to specialists, like Atlantic Neuro, who would otherwise be ONET.

71.     Not only does the MultiPlan content published on Cigna and United's websites further demonstrate a course of dealing with Atlantic Neuro and other similarly situated ONET providers who contract with MultiPlan, but it also illustrates how Cigna and United promoted their

14

access to MultiPlan providers like Atlantic Neuro to enrich themselves by increasing revenues.

72.    This agreement is further solidified by MultiPlan's website, where they answer the FAQ '[w]hy is a MultiPlan log on my insurance ID card?" by explaining that "[y]our health plan is most likely utilizing the MultiPlan's Complementary Provider Network to give you access to an additional choice of providers that have agreed to offer a discount for service."

73.    Cigna and United were further enriched on self-funded claims, like the claims in issue in this case, through the Shared Savings Fees they were able to charge those self-funded clients by accessing the MultiPlan's Complementary Provider Network and the Contract Fee payable to providers enrolled in that network, like Atlantic Neuro.

74.    All Defendants knew, or should have known, that Atlantic Neuro relied on the express written representations made by MultiPlan and the representations and consistent course of dealing, established with both United and Cigna, that Atlantic Neuro would be paid its Contracted Rate for services rendered to any patient presenting to Atlantic Neuro with a Cigna or United insurance card containing the MultiPlan logo.

75.    Despite this, when Atlantic Neuro billed Cigna for services rendered to H.I., a patient enrolled in a Benefit Program administered by Cigna, and whose insurance card contained the MultiPlan logo, Cigna paid Atlantic Neuro far less than its Contract Rate.

76.    Similarly, when Atlantic Neuro billed United for services rendered to M.D. and C.F., two patients enrolled in a Benefit Programs administered by United, and whose insurance card contained the MultiPlan logo, United paid Atlantic Neuro far less than its Contract Rate.

77.    This action seeks damages from the Defendants for their collective failure to compensate Atlantic Neuro pursuant to the Contract Rate established by the Provider Agreement and their consistent course of dealing with Atlantic Neuro with respect to professional services

rendered to its patients H.I., M.D., and C.F. Moreover, it is manifestly unjust that the Defendants received the benefit of Atlantic Neuro's participation in the MultiPlan's Complementary Provider Network and its treatment of the Cigna and United members in question, including but not limited to the collection and division of Shared Savings Fees by and among Cigna and United on the one hand, and MultiPlan on the other, without honoring Atlantic Neuro's Contract Rate.

78.     The amount due to Atlantic Neuro collectively from the Defendants is not less than $431,208.69.

## DEFENDANTS' UNDERPAYMENT OF CLAIMS

### A.  Atlantic Neuro's Claims and Appeals on Behalf of its Patient H.I.

79.     H.I., age 40, is insured through a Benefit Program administered by Cigna on behalf of CBRE Group. The insurance card(s) issued to H.I. by Cigna includes the MultiPlan logo, indicating that H.I.'s Benefit Program participates with MultiPlan.

80.     H.I. underwent three surgical procedures performed by surgeons affiliated with Atlantic Neuro that were later billed to Cigna and paid at rates far below the Contract Rate set forth in the Provider Agreement. In all, Atlantic Neuro submitted claims totaling $458,264.14 to Cigna for services rendered to H.I., and was paid $8,064.52, less than 2% of its billed charges.

### *11/9/2017 Date of Service*

81.     On November 9, 2017, H.I. presented to Morristown Memorial Hospital's Emergency Department with complaints of severe leg pain and acute and progressive leg weakness. At the time, Jay Young Chun, MD, PhD, Vice President of Atlantic Neuro and Director of Neurotrauma at Morristown Memorial Medical Center, was the specialist on-call.

82.     Upon examining H.I., Dr. Chun diagnosed her with focal L3-4 stenosis with neural compression, L4-5 large herniated disk with neural compression with significant neurologic deficit and severe acute and progressive pain. H.I. was emergently taken to the operating room and Dr.

Chun performed L3-4 laminectomy, foraminotomy, partial facetectomy using microscope, use of intraoperative fluoroscopy and an L4-5 laminectomy, foraminotomy, partial facetectomy, discectomy using microscope, use of intraoperative fluoroscopy.

83.     For these services, Atlantic Neuro submitted charges to Cigna in the amount of $39,020.00. Cigna deemed the services "Covered Services" as defined by the Provider Agreement, but nevertheless only paid Atlantic Neuro $1,493.32, less than 4% of its billed charges.

84.     Pursuant to Paragraph 5.3 of the Provider Agreement, Atlantic Neuro submitted a challenge to Cigna directly related to its underpayment of the 11/9/17 date of service in February 2018, less than a month after receiving the underpayment from Cigna. It submitted additional challenges in June 2018, November 2018, and November 2019, to no avail. Cigna's sole explanation for its level of payment was that it was subject to a "pricing review performed by an outside vendor." Upon information and belief, that outside pricing vendor was MultiPlan and/or one of its affiliates. The only basis for Multiplan to 'price' the claim would be at the Contract Rate.

*1/25/2019 Date of Service*

85.     On January 25, 2019, H.I. again presented to Morristown Memorial Hospital's emergency department with complaints of severe leg pain as well as deficit. Imaging determined a herniated lumbar disk. H.I. was immediately taken to the operating room and underwent anterior lumbar interbody fusion, use of morselized autograft, use of infuse, anterior antibody instrumentation, use of a polyetheretherketone antibody device, and use of intraoperative fluoroscopy performed by Dr. Chun. The procedure was performed with Amit V. Patel, with Dr. Chun and Dr. Patel operating as "co-surgeons."

86.     For these services, Atlantic Neuro submitted charges to Cigna in the amount of $137,773.46. Cigna deemed the services "Covered Services" as defined by the Provider

Agreement by, upon information and belief, paying both Morristown Hospital and Dr. Patel for their services as part of the overall intervention. Cigna, nevertheless, paid Atlantic Neuro nothing.

87.     Pursuant to Paragraph 5.3 of the Provider Agreement, Atlantic Neuro submitted a challenge to Cigna directly related to its underpayment of the 1/25/19 date of service in July 2019, less than five months after receiving the underpayment and corresponding explanation from Cigna. It submitted an additional challenge in February 2020, to no avail.

*3/6/2019 Date of Service*

88.     On March 6, 2019, H.I. presented to Overlook Medical Center with a diagnosis of severe cord compression with progressive deficit. H.I. was immediately taken to the operating room and underwent an anterior cervical diskectomy and fusion, anterior cervical diskectomy, foraminotomy, partial facetectomy, an anterior interbody fusion, use of a polyetheretherketone interbody device, use of an anterior cervical instrument, use of morselized autograft and allograft, use of microscope, and use of intraoperative fluoroscopy performed by Dr. Chun.

89.     For these services, Atlantic Neuro submitted charges to Cigna in the amount of $181,470.68. Cigna deemed the services "Covered Services" as defined by the Provider Agreement, but nevertheless only paid Atlantic Neuro $6,571.20, less than 4% of its billed charges.

90.     Pursuant to Paragraph 5.3 of the Provider Agreement, Atlantic Neuro submitted a challenge to Cigna directly related to its underpayment of the 1/25/19 date of service in July 2019, less than three months after receiving the underpayment and corresponding explanation from Cigna. It submitted an additional challenge in September 2020, to no avail. During the pendency of Atlantic Neuro's challenges, a third-party pricing negotiator contacted Atlantic Neuro on behalf of Cigna on multiple occasions, offering each time to settle the dispute for less than $15,000, or less than 9% of Atlantic Neuro's billed charges.

**B.**     **Atlantic Neuro's Claims and Appeals on Behalf of its Patient M.D.**

91.     M.D., age 56, is insured through a Benefit Program administered by United on behalf of New York University. The insurance card(s) issued to M.D. by United includes the MultiPlan logo, indicating that M.D.'s Benefit Program participates with MultiPlan.

92.     M.D. underwent a surgical procedure performed by surgeons affiliated with Atlantic Neuro that were later billed to United and paid at rates far below the Contract Rate set forth in the Provider Agreement. In all, Atlantic Neuro submitted claims totaling $49,803,.02 to United for services rendered to M.D., and was paid $481.98, less than 2% of its billed charges.

93.     On July 9, 2018, Mr. Dailey presented to Morristown Medical Center with a diagnosis of left-sided herniated disk fragment at L3-4. M.D. was immediately taken to the operating room and underwent an anterior a left lumbar microdiscectomy and foraminotomy performed by Kyle T. Chapple, M.D., and assisted by Cris Amato of Atlantic Neuro.

94.     For these services, Atlantic Neuro submitted charges to United in the amount of $49,803.12. United deemed the services "Covered Services" as defined by the Provider Agreement, but nevertheless only paid Atlantic Neuro $481.98, with $786.16 applied to M.D.'s deductible. So, in all, United process these claims to pay at less than 3% of Atlantic Neuro's billed charges.

95.     Pursuant to Paragraph 5.3 of the Provider Agreement, Atlantic Neuro submitted a challenge to United directly related to its underpayment of the 7/9/18 date of service in September 2018, less than a month after receiving the underpayment and corresponding explanation from United. It submitted additional challenges  in February 2019, April 2019, and February 2020, to no avail.

**C.      Atlantic Neuro's Claims and Appeals on Behalf of its Patient C.F.**

96.      C.F., age 36, is insured through a Benefit Program administered by United on behalf of New York University. The insurance card(s) issued to C.F. by United includes the MultiPlan logo, indicating that C.F.'s Benefit Program participates with MultiPlan.

97.      C.F. underwent three surgical procedures performed by surgeons affiliated with Atlantic Neuro that were later billed to United and paid at rates far below the Contract Rate set forth in the Provider Agreement. In all, Atlantic Neuro submitted claims totaling $125,881.60 to Cigna for services rendered to C.F., and was paid $4,008.94, less than 4% of its billed charges.

*12/17/2018 Date of Service*

98.      On December 17, 2018, C.F. presented to Overlook Medical Center with a diagnosis of metastatic neoplasm to the right cerebellum. C.F. was taken to the operating room and underwent CyberKnife stereotactic radiosurgical treatment of a metastatic neoplasm to the right cerebellum by Yaron Moshel, M.D., of Atlantic Neuro.

99.      For these services, Atlantic Neuro submitted charges to United in the amount of $41,600. United deemed the services "Covered Services" as defined by the Provider Agreement by, upon information and belief, paying Overlook Medical Center for its services as part of the overall intervention. United, nevertheless, paid Atlantic Neuro nothing.

100.      Pursuant to Paragraph 5.3 of the Provider Agreement, Atlantic Neuro submitted a challenge to United directly related to its underpayment of the 12/17/18 date of service in February 2019, less a month after receiving the underpayment and corresponding explanation from United. It submitted additional challenges in August 2019 and October 2019, to no avail.

*12/21/2018 Date of Service*

101.      On December 21, 2018, C.F. underwent a second staged procedure to treat a

metastatic lesion to the right pre-ventricular area, again by Dr. Moshel of Atlantis Neuro.

102.    For these services, Atlantic Neuro submitted charges to United in the amount of $41,600. United deemed the services "Covered Services" as defined by the Provider Agreement by, upon information and belief, paying Overlook Medical Center for its services as part of the overall intervention. United, nevertheless, paid Atlantic Neuro nothing.

103.    Pursuant to Paragraph 5.3 of the Provider Agreement, Atlantic Neuro submitted a challenge to United directly related to its underpayment of the 12/21/18 date of service in February 2019, less than a month after receiving the underpayment and corresponding explanation from United. It submitted additional challenges in August 2019 and October 2019, to no avail.

*2/22/2019 Date of Service*

104.    On February 22, 2019, presented to Overlook Medical Center with a diagnosis of metastatic neoplasm to the right occipital lobe. C.F. was taken to the operating room and underwent CyberKnife stereotactic radiosurgical treatment of a metastatic neoplasm to the right occipital lobe by Dr. Moshel, of Atlantic Neuro.

105.    For these services, Atlantic Neuro submitted charges to United in the amount of $42,681.60. United deemed the services "Covered Services" as defined by the Provider Agreement but nevertheless only paid Atlantic Neuro $4,008.94, or less than 10% if its billed charges.

106.    Pursuant to Paragraph 5.3 of the Provider Agreement, Atlantic Neuro submitted a challenge to United directly related to its underpayment of the 2/22/19 date of service in March 2019, less a month after receiving the underpayment and corresponding explanation from United. It submitted additional two challenges in August 2019, to no avail.

**COUNT I**
**BREACH OF CONTRACT**
**(Against MultiPlan Only)**

107.    The foregoing allegations are re-alleged and incorporated by reference as if fully

set forth herein.

108.    In November 2011, Atlantic Neuro and MultiPlan entered into the Provider Agreement.

109.    MultiPlan promised to require its Clients and Users, including Cigna and United, to reimburse Atlantic Neuro its Contract Rate for surgical and related medical services rendered by Atlantic Neuro's medical staff to patients whose Benefit Programs elected to participate in the MultiPlan program, as identified by the MultiPlan logo on the patients' insurance cards.

110.    Based on the January 2015 amendment to the Provider Agreement, Atlantic Neuro's Contract Rate under the Provider Agreement are 70% of Atlantic Neuro's billed charges.

111.    When Atlantic Neuro billed Cigna for services rendered to H.I., a patient enrolled in a Benefit Program administered by Cigna, and whose insurance card contained the MultiPlan logo, Cigna paid Atlantic Neuro far less than its Contract Rate.

112.    When Atlantic Neuro billed United for services rendered to M.D. and C.F., two patients enrolled in Benefit Programs administered by United, and whose insurance cards contained the MultiPlan logo, United paid Atlantic Neuro far less than its Contract Rate.

113.    MultiPlan breached its contract with Atlantic Neuro by failing to ensure its Clients Cigna and United reimbursed Atlantic Neuro for services rendered to H.I. in the case of Cigna, and M.D. and C.F., in the case of United, at the Contract Rate.

114.    As a direct and proximate result of MultiPlan's breach of its Agreement contract with Atlantic Neuro, Atlantic Neuro has sustained damages not less than $431,208.69.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(Against Cigna Only)**

115.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

116.    Cigna indicated by dealings and circumstances surrounding the relationship, express representations, and course of conduct, that they would pay the Contract Rate to Atlantic Neuro for medical services provided to insureds whose plan was in MultiPlan's Network.

117.    Cigna is in the business of underwriting and administering commercial health benefit plans, it is responsible for reimbursing medical providers for services rendered to its members consistent with contractual obligations.

118.    By placing the MultiPlan logo on H.I.'s insurance card, Cigna indicated to Atlantic Neuro that the Benefit Program through which H.I. has health benefits participated in MultiPlan's Complimentary Network.

119.    Cigna has established conduct and course of dealing with Atlantic Neuro, whereas it expressly paid the MultiPlan Contract Rate for services provided to patient's whose insurance cards have the MultiPlan logo. *See* ¶¶ 48-52.

120.    Cigna's marketing communications to its insureds and the public represent its clear participation and subsequent expectation to providers of their participation in the MultiPlan's Complimentary Provider Network. *See* ¶¶ 66-67.

121.    Cigna's representation that H.I.'s Benefit Program participated in MultiPlan's Complimentary Provider Network and their conduct in the dealing with Atlantic Neuro, created and implied-in-fact contract with Atlantic Neuro promising that it would be paid pursuant to the Contract Rate set forth in the Provider Agreement.

122.    By substantially underpaying Atlantic Neuro for the professional services provided to H.I., Cigna has breached that implied-in-fact contact.

123.    As a direct and proximate result of Cigna's breach of its implied-in-fact contract with Atlantic Neuro, Atlantic Neuro has sustained damages not less than $312,720.38.

## <u>COUNT III</u>
## BREACH OF IMPLIED CONTRACT
### (Against United Only)

124.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

125.    United indicated by dealings and circumstances surrounding the relationship, express representations, and course of conduct that it would pay the Contract Rate to Atlantic Neuro for medical services provided to insureds whose plan was in MultiPlan's Complimentary Provider Network.

126.    United is in the business of underwriting and administering commercial health benefit plans, it is responsible for reimbursing medical providers for services rendered to its insureds consisted with contractual obligations.

127.    By placing the MultiPlan logo on M.D.'s and C.F.'s insurance cards, United indicated to Atlantic Neuro that the Benefit Programs through which M.D. and C.F. have health benefits participated in MultiPlan's Complimentary Provider Network.

128.    United has established conduct and course of dealing with Atlantic Neuro, whereas it expressly paid the Contract Rate for services provided to patient's whose insurance cards have the MultiPlan logo. *See* ¶¶ 53-59; 62.

129.    United's marketing communications to its insureds and the general public represent its clear participation and subsequent expectation to providers of their participation in the MultiPlan's Complementary Provider Network. *See* ¶¶ 68-69.

130.    United's representations that M.D.'s and C.F.'s Benefit Programs participated in MultiPlan's Complimentary Network and their conduct in dealing with Atlantic Neuro, created an implied-in-fact contract with Atlantic Neuro promising that it would be paid pursuant to the Contract Rate set forth in the Provider Agreement.

131.    By substantially underpaying Atlantic Neuro for the professional services provided to M.D. and C.F., United has breached that implied-in-fact contact.

132.    As a direct and proximate result of United's breach of its implied-in-fact contract with Atlantic Neuro, Atlantic Neuro has sustained damages not less than $118,488.31.

**COUNT IV**
**BREACH OF IMPLIED WARRANTY**
**OF GOOD FAITH AND FAIR DEALING**
**(Against all Defendants)**

133.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

134.    New Jersey law implies in every contractual relationship an implied warranty of good and fair dealing whereby parties are obligated to act in a manner that is consistent with the reasonable expectations of the other party to the contract.

135.    Defendants violated the implied warranty of good faith and fair dealing with respect to their contracts with Atlantic Neuro through acts of commission and omission that were wrongful and without justification.

136.    Specifically, Defendant MultiPlan failed to enforce Paragraph 4.7 of the Provider Agreement, where it "will require Clients and its Users to use the Contract Rate." By allowing its Clients and Users to indiscriminately chose to not pay the Contract Rate to contracted providers, MultiPlan has breached the implied warranty of good faith and fair dealing.

137.    Similarly, by indiscriminately failing to pay the Contract Rate which they promised to pay through an implied-in-fact contract, Cigna and United have also breached the implied warrant of good faith and fair dealing.

138.    And finally, because Defendants' breach of their contractual obligations to Atlantic Neuro were motivated, at least in part, by their desire to increase the Shared Savings Fees paid by

Cigna and/or United's self-funded clients to be shared by and among them, Defendants' breaches of their obligations to Atlantic Neuro were in bad faith, and utterly inconsistent with the reasonable expectations of Atlantic Neuro, the other party to the contract.

139.    As a direct and proximate result of Defendants breaches, Atlantic Neuro has sustained damages not less than $431,208.69.

## COUNT V
## PROMISSORY ESTOPPEL
### (Against all Defendants)

140.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

141.    Defendants' collective, consistent, and repeated representations that MultiPlan would enforce, and that Cigna and United would honor, the Contract Rate in the Provider Agreement for services rendered to H.I. in the case of Cigna, and M.D. and C.F., in the case of United, represented a promise to Atlantic Neuro.

142.    Defendants knew or should have known that Atlantic Neuro would rely upon Defendants promises to honor the Contract Rate in the Provider Agreement.

143.    Atlantic Neuro substantially relied upon the promises made by the Defendants that they would honor the Contract Rate in the Provider Agreement.

144.    Injustice can only be avoided by legally enforcing Defendants promises to enforce or honor the Contract Rate in the Provider Agreement.

## COUNT VI
## QUANTUM MERUIT
### (Against all Defendants)

145.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

146.    Atlantic Neuro furnished valuable services in the form of surgical and related

medical interventions to H.I., M.D., and C.F.

147.    The valuable services provided to H.I., M.D., and C.F. were provided to and accepted H.I., M.D., and C.F. under such circumstances that Defendants were reasonably notified that Atlantic Neuro in providing the services in question expected to be paid its Contract Rate under the Provider Agreement.

148.    Defendants received the benefit of Atlantic Neuro's participation in the MultiPlan's Complementary Provider Network and its treatment of the Cigna and United members in question, including but not limited to the collection and division of Shared Savings Fees by and among Cigna and United on the one hand, and MultiPlan on the other, without honoring Atlantic Neuro's Contract Rate

149.    It is manifestly unjust that the Defendants received the benefit of Atlantic Neuro's participation in the MultiPlan's Complementary Provider Network and its treatment of the Cigna and United members in question, including but not limited to the collection and division of Shared Savings Fees by and among Cigna and United on the one hand, and MultiPlan on the other, without honoring Atlantic Neuro's Contract Rate.

**WHEREFORE**, Plaintiffs demand judgment on all the foregoing counts in their favor against Defendants as follows:

A.    Awarding Atlantic Neuro compensatory damages not less than $431,208.69;

B.    Awarding Atlantic Neuro pre-judgment interest under the New Jersey prompt payment law and the regulations promulgated thereunder;

C.    Awarding Atlantic Neuro punitive damages for Defendants' malicious and oppressive conduct that reflected a conscious disregard of Atlantic Neuro's rights.

D.    Awarding Atlantic Neuro disbursements and expenses of this action, including

reasonable attorneys' fees, in amounts to be determined by the Court; and

E.    Granting such other and further relief as is just and proper considering the evidence.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Atlantic Neuro hereby demands a trial by jury of any issue trial of right by a jury.

Dated: March 4, 2022                          Respectfully submitted,

/s/ John W. Leardi
John W. Leardi
Nicole P. Allocca
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
609-799-5150

Leslie Howard
Michael Fried
COHEN HOWARD, LLP
766 Shrewsbury Ave., Suite 200
Tinton Falls, NJ 07724
732-747-5202

*Attorneys for Plaintiff*
*Atlantic Neurosurgical Specialists, P.A.*